IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY D. LEISER

    Plaintiff,

v.

KAREN KLOTH, et al.,

    Defendants.

OPINION and ORDER

Case No. 15-cv-768-slc

*Pro se* plaintiff Jeffrey D. Leiser is proceeding in this lawsuit on Eighth Amendment claims against defendants Karen Kloth, Paula Stoudt, and Reed Richardson, related to Kloth's alleged harassment and Stoudt and Richardson's failure to protect him from harassment. Defendants filed a Motion for Summary Judgment (dkt. 21), which I am denying, and Leiser filed a Motion to Strike (dkt. 38) which I also am denying. Also, the parties have two pending motions related to Leiser's discovery requests (dkts. 17-18), which I am denying in part. Finally, I am striking the upcoming trial date and scheduling this matter for a telephonic scheduling conference.

## UNDISPUTED FACTS

### I. Parties

Leiser is a DOC inmate who was housed at the Stanley Correctional Institution at all times relevant to his claims in this lawsuit. During his time at Stanley, Leiser was diagnosed with post-traumatic stress disorder (PTSD) related to a sexual assault when he was a child. One trigger for Leiser's PTSD is when someone stands directly behind him. According to Leiser, when his PTSD is triggered, he experiences flashbacks and becomes angry, starts sweating, knocks his head

against the wall, yells and screams, and wants to attack or hurt the people who trigger his PTSD. (Leiser decl., dkt. 31, ¶ 18.)

Defendant Karen Kloth was employed at Stanley as a sergeant during the relevant time period. Defendant Paula Stoudt was a Unit Manager at Stanley, and her responsibilities included supervising the security, treatment, and general living conditions of the inmates. Defendant Reed Richardson was the warden at Stanley during the relevant period, and he was responsible for the overall administration and operation there.

## II. Stanley's Psychological Services Unit (PSU) Approach to Inmate Diagnoses

During the relevant time period, non-defendant Dr. Jesse Frey was the psychological supervisor at Stanley, and his responsibilities included overseeing inmate mental health treatment there. Dr. Frey explains that PSU staff do not inform security staff about inmates' clinical diagnoses. An exception to this general rule arises when an inmate needs a special accommodation to address an inmate-specific psychological condition. In such a case, psychological services staff informs unit security staff of the particular symptoms, behavioral or emotional responses of the inmate, and the special accommodations needed to address that inmate's issues. Dr. Frey states that:

> It is my opinion, to a reasonable degree of clinical certainty based on my review of Leiser's clinical records and my interactions with him that Leiser did not need an accommodation directive precluding Stanley security staff from standing or moving behind him.

(Frey May 9, 2017 Declaration, dkt. 27, ¶ 16.)

**III.     Leiser's PTSD Diagnosis and Treatment by PSU**

Leiser worked consistently with PSU staff on a variety of psychological issues. During the relevant time period, Leiser's treating clinician was Nichole Kaeppler. It appears that she had her first session with Leiser on October 2, 2014, at which point she noted that Leiser made "mention of psychotherapeutic treatment as an adolescent while in foster care." (Ex. 1005, dkt. 27-1, at 1.) According to Leiser, he told Kaeppler that he suffers from PTSD as a result of a childhood trauma in which he was knocked out while talking to a blond female. (Leiser decl., dkt. 31, ¶ 10.) Leiser also claims that during that session he told Kaeppler specifically that Kloth stands behind him to trigger his PTSD, but Kaeppler's notes do not include that detail.

On December 18, 2014, Kaeppler noted that Leiser told her more about his childhood trauma, this time revealing that the trauma included sexual assault. Leiser also told her that he related the trauma to his refusal to trust others as well as his discomfort having people stand behind him. (Ex. 1005, dkt. 27-1, at 4.) At that point, Kaeppler made a plan to clinically monitor him to rule out PTSD. On January 8, 2015, Kaeppler met with Leiser again; she noted that Leiser did not want to discuss his childhood sexual abuse and again, and noted her plan to monitor him to rule out PTSD. On February 5, 2015, Kaeppler noted that Leiser talked more about his childhood sexual assault. Kaeppler also noted that the themes he presented seemed "to root from symptoms of PTSD." (*Id.* at 7.) As such, she ordered a follow up in three weeks, and planned with consult with Dr. Frey about Leiser's symptoms to determine if an official PTSD diagnosis was appropriate. She also ordered that Leiser receive PTSD workbook materials. They met again on March 12, 2015, but the focus of that session was Leiser's loss of a friend.

3

On March 30, 2015, Kaeppler met with Leiser, and they again discussed his fear of having people stand behind him. She noted that Leiser specifically said that his anxiety spiked when he was waiting in line for medications in the Health Services Unit (HSU). Kaeppler noted that she planned to assign him a PTSD diagnosis after consulting with Dr. Frey, and Dr. Frey signed that treatment note on April 13, 2015.

Kaeppler and Dr. Frey continued to see Leiser. At times, the treatment notes indicate that Leiser reported that he was having problems with unit staff standing behind him, but the notes did not indicate that Leiser specifically reported that Kloth was harassing him or deliberately triggering his PTSD. (*See* dkts. 31-2, 31-7, 31-8.) Neither Dr. Frey nor Kaeppler initiated a treatment plan that would accommodate Leiser's needs related to his PTSD. Additionally, neither Kaeppler, nor anyone else from Stanley's PSU informed Stanley's other employees of Leiser's PTSD diagnosis or that his PTSD was triggered when people stood behind him. Dr. Frey explains that PSU did *not* create or implement an accommodation prohibiting Stanley staff from standing behind him because (1) psychological staff focus on internal, not external, changes, and (2) Stanley is too closely populated to ensure that no one would stand behind Leiser, so any such accommodation could not be implemented.

Leiser does not dispute that there was no official accommodation for him at Stanley. Instead, he contends that he told his psychiatrist, Dr. Luxford, about the problem he had waiting for his medications, and that afterwards, Dr. Luxford arranged for Leiser to receive his medications inside the HSU rather than waiting in line. (Leiser decl., dkt. 31, ¶ 19.)

## IV. Sergeant Kloth

At some point in 2014 and 2015, Leiser was housed in the unit where Kloth was sergeant. The parties dispute whether Leiser told Kloth that he suffered from PTSD and that his PTSD was triggered when someone stands directly behind him. Leiser submitted his own declaration, stating that when he told Kloth about his PTSD, Kloth responded that she can stand where she wants and he would have to learn to deal with it. (Leiser decl., dkt. 31, ¶ 10.) Beyond his declaration, Leiser submits declarations from three other inmates, recounting what they saw when Kloth and Leiser interacted. Specifically, Leiser's brother, Loren Leiser (Loren), states that he (Loren) told Kloth that she should not stand behind Leiser because it would trigger his PTSD, warning her that it would be her fault if Leiser "snapped on her" and hurt her. (Loren Leiser decl, dkt. 37, ¶¶ 16-18.) Loren also states that he saw Leiser tell Kloth not to stand behind him as well. (*Id.* ¶ 19.) Loren describes what happens to Leiser when his PTSD is triggered, explaining that he has two levels of PTSD: "level-one" involves fidgeting, sweating, and/or darting eye movements, sometimes causing him to yell and walk away; "level-two" involves level-one symptoms, plus shaky hands, twitchy leg movements, and increased heart rate. (*Id.* ¶ 15.) While Loren states that he warned Kloth that he might "snap on her," Loren does not state that Kloth saw Leiser experience these symptoms when Leiser interacted with her.

Two other inmates, Robert Sekola and Terry Gorichs, state that they saw Leiser tell Kloth not to stand behind him in the cafeteria but she responded that she would stand where she wanted and thereafter continued to stand behind him. (Gorichs decl., dkt. 35, ¶¶ 2-3; Sekola decl., dkt. 36.) Sekola also states that when he saw Kloth stand behind Leiser, Leiser got angry and started shaking and sweating. (Sekola decl, dkt. 36 ¶ 4.) Gorichs also explained that he was

5

Leiser's cellmate, and that he saw Leiser respond to Kloth standing behind him by dumping his tray and going back to his cell, where he would be shaking, sweating, and talking to himself, saying things like "She is not worth it" and "don't hurt her, she's not the one!" (Gorichs decl., dkt. 35, ¶¶ 4-6.) Gorichs states that Kloth would stand behind Leiser "every time" she worked in Leiser's unit as sergeant.

For her part, Kloth claims that, prior to Leiser bringing this lawsuit, she did not know that Leiser had PTSD or that standing behind Leiser triggered his PTSD. Kloth admits that in both the day room and cafeteria, she stood behind inmates, including Leiser, while she was monitoring them. Yet she states that she never had any conversations with Leiser about his PTSD, nor did Leiser complain to her that standing behind him would trigger his PTSD. Furthermore, Kloth states that PSU staff never informed her that Leiser had PTSD, and she was unaware of any accommodation issued to Leiser for staff not to stand behind him to avoid triggering his PTSD.

## V. Leiser's Complaints to Stoudt and Richardson about Kloth

Stoudt worked at the unit manager where Leiser was housed. Leiser often complained to Stoudt about Kloth, and Stoudt knew that Leiser did not like Kloth. According to Stoudt, however, Leiser did not make any complaints – either orally or in writing – in which he specifically told her that Kloth was attempting to trigger his PTSD by standing behind him.

More specifically, on May of 2015, Stout reviewed the a conduct report Kloth issued Leiser for disobeying orders. Stoudt was responsible for reviewing the conduct report and Leiser's statement in his defense. Although Leiser repeatedly stated that Kloth was harassing him by

6

issuing the conduct report, Leiser did not report that Kloth stood behind him in an attempt to trigger his PTSD. (Ex. 1001, dkt. 24-1, at 3.) Stoudt explains that after reviewing the conduct report and Leiser's statement, Stoudt gave Leiser a disposition of a reprimand. Stoudt further states that she did not believe that the statements in the conduct report indicated that Kloth was harassing Leiser.

As to Richardson, Leiser claims that on October 14, 2014, he sent Richardson a letter in which Leiser reports that he suffers from PTSD and requested that Kloth be prohibited from standing behind him. (Dkt. 31-12.) Leiser also claims that when Richardson was doing rounds through Stanley, Leiser talked to him about Kloth, but Richardson failed to take any action.

Richardson disputes that he ever received Leiser's October 14 letter, and similarly states that he never had conversations with Leiser about this issue. Rather, according to Richardson, when he reviewed acted as the Reviewing Authority for inmate complaints filed at Stanley, he never saw any complaints from Leiser alleging that Kloth was harassing him by standing behind him to trigger his PTSD. Richardson explains that he did review one complaint Leiser filed related to Kloth, SCI-2015-10912, but in that complaint Leiser challenged only Kloth's decision to give him a conduct report, he did not claim that Kloth deliberately would stand behind him in order to trigger Leiser's PTSD. (*See* dkt. 26-2.)

OPINION

Leiser is proceeding on an Eighth Amendment claim against defendant Kloth for her alleged harassment, and a related Eighth Amendment claim against defendants Paula Stoudt and Reed Richardson for their failure to take action to stop Kloth's harassment. Defendants moved

7

for summary judgment on the ground that Kloth's behavior did not rise to the level of cruel and unusual punishment, and that the evidence does not establish that any of them knew that he suffered from PTSD that was triggered when people stand behind him. In addition, defendants argue that qualified immunity shields them for money damages here. Although Leiser faces a steep uphill battle at trial, I am constrained to deny defendants' motion.

As an initial matter, Leiser asks that I strike Dr. Frey's declaration from the record because Frey was not Leiser's clinician and Frey does not have first-hand knowledge of Leiser's discussion with his clinician. (Dkt. 38.) However, Dr. Frey's declaration includes only statements related to Stanley's approach to special accommodations as well as his review of Kaeppler's notes and his personal interactions with Leiser. Additionally, Leiser's treatment records show that Dr. Frey consistently reviewed and signed off on Kaeppler's session notes, and that Dr. Frey met with Leiser personally. (*See generally* Ex. 1005, dkt. 27-1.) Accordingly, Leiser has not established that Dr. Frey's statements in his declaration were not based on his personal knowledge or involvement in Leiser's care. I am denying Leiser's motion to strike.

I.  **Eighth Amendment Harassment Claim**

The standard for assessing Eighth Amendment claims of cruel an unusual punishment includes objective and subjective components. *Fillmore v. Page*, 358 F.3d 496, 509 (7th Cir. 2004). As to the objective component, the test is "not the actual fear of the victim, but what a 'reasonable' victim would fear." *Dobbey v. Illinois Dept. of Corr.*, 574 F.3d 443, 445 (7th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1970)). The subjective component evaluates

8

whether the state actor intended to inflict physical or psychological pain. *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003).

With respect to harassment claims specifically, the court also has noted that "[t]he line between 'mere' harassment and 'cruel and unusual punishment' is fuzzy, but requires "a credible threat to kill, or to inflict any other physical injury" for harassment to rise to the level of a constitutional violation. *Dobbey*, 574 F.3d at 445; *see also Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015) ("Threats of grave violence can constitute cruel and unusual punishment under the Eighth Amendment."). More specifically, the Seventh Circuit has stated, "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015) (citing *DeWalt v. Carter*, 224 F.3d, 607, 612 (7th Cir. 2002)). However, in *Beal*, the court nevertheless concluded that harassment in the form calling an inmate names such as "punk, fag, sissy, and queer" was sufficient to state an Eighth Amendment claim because the allegations supported the finding of psychological harm and an increased the likelihood of sexual assaults on the inmate, thus stating a claim for cruel and unusual punishment. *Id.* at 358.

In this case, the objective prong of the analysis is subsumed within the subjective prong–at least initially–because the fact that Kloth stood behind Leiser in the cafeteria is objectively innocuous. The operative questions are: did Kloth stand behind Leiser knowing that this could trigger Leiser's PTSD; and, even if she did, did this rise to the level of an injury cognizable by the Eighth Amendment?

At the Rule 56 stage, the court must accept as true the nonmovant's version of events. According to Leiser and his brother, they both told Kloth that Leiser had PTSD and that if she

9

stood behind him, this could trigger the condition. Both men claim that Kloth responded that she did not care, she was going to stand where she wanted to. Kloth denies all this, and other evidence cited above (for instance, Leiser's failure to make this claim in response to the conduct report and the failure of the PSU notes to reflect Leiser's claim) calls into question Leiser's averments to the court. Kloth may well be telling the truth and the Leisers not, but this does not help Kloth at the summary judgment stage. The court must assume that Kloth knew that Leiser had PTSD, that she knew standing behind him was a trigger, and that she continued to stand behind Leiser anyway. This could be viewed as "the very definition of deliberate indifference." *Rowe v. Gibson*, 798 F.3d 622, 635 (7th Cir. 2015) (Rovner, J., concurring) (citing *Green v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)).

A corollary to this observation is that, even accepting Leiser's version of the facts as true, there is no direct evidence that Kloth would stand behind Leiser for the purpose of provoking a PTSD attack. Rather, this is the inference that Leiser wants the court to draw from his supporting affidavits, and since I have to accept Leiser's version of events at true, and since it is not an unreasonable inference to draw if I have to accept this version of events, then, for the purposes of summary judgment, I am constrained to draw this inference in Leiser's favor.

As to the second question, to survive summary judgment, Leiser must present evidence that Kloth "intended to humiliate and inflict psychological pain." *Calhoun*, 319 F.3d at 939. I am not persuaded that Leiser has done this. Kaeppler and Dr. Frey were aware that Leiser *would* have people standing behind him while he was incarcerated because Leiser "resided in a densely populated correctional facility"; *a fortiori*, Kaeppler and Frey knew that Leiser's PTSD likely would be triggered in this environment. Even so, Dr. Frey in PSU has opined to a reasonable

10

degree of medical certainty that Leiser did not need an accommodation for his PTSD. Therefore, PSU staff did not share Leiser's diagnosis with any correctional officers (including Kloth), and they did not provide any information to any correctional officers (including Kloth) about the symptoms of PTSD. The implicit but logical and reasonable conclusion is that even if Leiser's PTSD was triggered by someone standing behind him, there was no substantial risk that Leiser would suffer serious psychological harm.

Leiser's own evidence corroborates this conclusion. His brother Loren reports that Leiser's "level-one" symptoms are fidgeting, sweating, and/or darting eye movements, and sometimes yelling and walking away; Leiser's "level-two" symptoms add to this shaky hands, twitchy leg movements, and increased heart rate. Leiser's cellmate reported essentially the same symptoms. However unpleasant these symptoms may have been to Leiser, they do not amount to the level of "serious harm" that would state a constitutional violation. This list of symptoms is no more severe than what many hot-tempered people exhibit when they get angry.[1]

Suppose, *arguendo*, that Kloth knew only that Leiser had a short fuse and could be easily provoked to yell, wave his arms, and turn red in the face with bulging eyes, and then, knowing these things, Kloth would try to press Leiser's buttons to get a rise out of him. Howsoever unprofessional and blameworthy this would be, would such conduct rise to the level of a constitutional violation? If it does not, would putting a DSM-5 label on Leiser's condition

---

[1] Leiser avers that when his PTSD is triggered, he also knocks his head against the wall and wants to attack or hurt the people who trigger his PTSD. While Leiser and Loren state that they told Kloth that Leiser might hurt her, there is no evidence that Leiser ever actually attacked anyone. Nor is there evidence suggesting that anyone else – not Kloth, not Leiser's cellmate, not anyone in PSU – knew that Leiser would knock his head against the wall.

change the outcome? "Not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Calhoun*, 319 F.3d at 939.

But the court in *Calhoun* continues:

> Instead, the Eighth Amendment prohibits unnecessary and wanton infliction of pain, thus forbidding punishment that is so totally without penological justification that it results in the gratuitous infliction of suffering. Such gratuitous infliction of pain always violates contemporary standards of decency and need not produce serious injury in order to violate the Eighth Amendment. Moreover, physical injury need not result for the punishment to state a cause of action, for the wanton infliction of psychological pain is also prohibited.

*Id.* at 939 (citations omitted).

In this case, Leiser and his witnesses claim that they told Kloth that Leiser had PTSD, that one of his triggers was people standing behind him, that this caused Leiser psychological and physical distress, and that after knowing these things, Kloth increased the amount of time she spent standing behind Leiser in the cafeteria, implicitly for the purpose of provoking a PTSD response. Kloth disputes all of this, but summary judgment is not available to Kloth on this record.

One could logically ask: in the absence of any information and direction from PSU regarding Leiser's PTSD, why should Kloth take Leiser's word for it? After all, if this really was a serious psychological issue, wouldn't PSU staff have flagged it for the correctional officers who had to deal with Leiser? This position has traction up to a point. If Leiser's version of events had stopped with Kloth simply continuing to behave toward Leiser as she always had behaved, then this court would be comfortable granting summary judgment in favor of Kloth. Leiser could not prevail on a constitutional claim based essentially on him (and his brother) directing Kloth how

12

to do her job in a way that did not upset Leiser. But in Leiser's version of events, Kloth intentionally exploited her new knowledge of Leiser's psychological vulnerability. Even *then*, it would not necessarily be a problem of constitutional dimension for her to have behaved in a manner intended to press Leiser's buttons if it turned out that there were no buttons to be pressed. But the buttons were there. PSU staff could have advised Kloth, if she had asked, that it was aware of Leiser's PTSD, it was working to de-condition him, and would Kloth please not make it harder for him by standing behind him more often than her normal duties required her to? Before changing her behavior to test Leiser's claim, Kloth would have had an obligation to confirm that her testing would not constitute deliberate indifference to Leiser's known psychological condition.

As already noted, from Kloth's perspective this entire discussion is counterfactual conjecture. How could she have consulted with PSU about a condition about which she had no knowledge and that she was not exacerbating, intentionally or otherwise? Point taken. But at summary judgment, the court cannot choose between competing material facts. It will be up to a jury to determine who is telling the truth.

## II. Eighth Amendment Failure to Protect Claim

I am denying defendants' motion as to Stoudt and Richardson for the same reason. Plaintiff claims that Stoudt's inaction after he told Stoudt that Kloth's conduct report was false, and Richardson's inaction after he filed an inmate complaint about Kloth, both constitute cruel and unusual punishment. As these claims focus on the failure to act, it is better to characterize them as claims that the defendants failed to protect him from harassment. *See Farmer v. Brennan*,

13

511 U.S. 825, 837 (1994). To state an Eighth Amendment failure to protect claim, a prisoner must allege that (1) he faced a "substantial risk of serious harm" and (2) the prison officials identified acted with "deliberate indifference" to that risk. *Id.* at 834. Deliberate indifference has two components: (1) a defendant must have actually known that the inmate was at risk; and (2) the defendant must have disregarded that risk by failing to take reasonable measures in response. *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005).

Here, because Leiser's factual submissions have allowed him to survive Kloth's summary judgment motion regarding Leiser's claim of cruel and unusual punishment, Leiser's claims that Stoudt and Richardson failed to take any action to protect him from Kloth likewise must be put to trial. Indeed, while Stoudt and Richardson dispute this, Leiser claims that he informed both of them that Kloth was purposefully triggering his PTSD. Then, claims Leiser, neither Stoudt nor Richardson took any action to investigate Kloth's behavior or to prevent it. If a jury were to believe Leiser's version of events, then it could conclude that Stoudt's and Richardson's inaction constituted deliberate indifference to the risk that Leiser would suffer severe psychological harm. I am denying defendants' motion for summary judgment as to Stoudt and Richardson as well.

### III. Qualified Immunity

Finally, because the record contains a version of events that would allow a jury to conclude that Kloth intentionally caused Leiser psychological harm, qualified immunity does not shield any defendant from liability. Qualified immunity protects government employees from

14

liability for civil damages for actions taken within the scope of their employment unless their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "In determining whether a constitutional right has been clearly established, it is unnecessary for the particular violation in question to have been previously held unlawful." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Instead, the question is whether the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

Leiser has submitted evidence that would allow a finding that all of the defendants knew that Leiser suffered psychological harm when his PTSD is triggered. While defendants dispute it, Leiser likewise submitted evidence that (1) Kloth intentionally triggered that harm, and (2) Stoudt and Richardson knew that she triggered his PTSD but did nothing to stop her. Because Leiser has a clearly established right to be free from intentionally inflicted psychological harm, qualified immunity does not shield defendants from liability at this stage.

**Pending Discovery Motions**

Finally, I will resolve the two remaining discovery motions, which, for the most part, are mirror images of one another. Leiser requests an order compelling defendants' to respond to his discovery requests related to (1) Kloth's termination from the Stanley and New Lisbon Correctional Institutions, (2) inmate complaints filed against Kloth since 2016, (3) mental health examination requirements for DOC employees, and (4) a log book entry that defendants

15

represent does not exist. Leiser seeks this information to support his theory that Kloth intended to harass him and in fact had a habit of harassing inmates. Defendants opposed the motion and, seek an *in camera* review of Kloth's disciplinary history and the complaints filed against her before turning those documents over.

The parties do not argue the details of the mental health examination and log book, so I'll resolve them quickly. As to the mental health examination, despite defendants' objection that the request was overly broad, Leiser argues only that the examination would provide evidence of Kloth's state of mind, but he has not suggested that he has any reason to believe that such an examination exists. As to the log book entry, defendants represented that it does not exist, and Leiser has not submitted any facts that suggest otherwise. Accordingly, I'm denying Leiser's requests related to those documents.

Leiser's requests related to Kloth's termination and the grievances filed against her since 2016 require a bit more discussion. Leiser argues that this information is relevant to proving that Kloth had a habit of harassing inmates, and thus carried out this habit against Leiser. Thus, he will seek to admit such evidence against Kloth pursuant to Fed. R. Evid. 406, which permits evidence of a "person's habit" to prove that "on a particular occasion the person … acted in accordance with the habit or routine practice." I doubt that Leiser will be able to make a sufficient showing to actually admit evidence that Kloth had a "habit" of harassing inmates. *Nelson v. City of Chicago*, 810 F.3d 1061, 1073 (7th Cir. 2016) ("Before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency" to act in a given manner, but rather, conduct that is semiautomatic in nature.") (citations omitted). However, the question of this

information's admissibility isn't before me, it's whether he is entitled to discovery of it. If Leiser's theory of the case is that Kloth habitually harassed inmates, I agree that such information could lead to admissible evidence.

For their part, defendants argue that the disciplinary and complaint information Leiser requested are not related to his lawsuit's narrow time frame, and thus that such information constitutes inadmissible "other acts" under Fed. R. Evid. 404(b), which permits character evidence for other purposes, which as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." While that's true, Leiser acknowledges that the only purpose of this evidence would be to prove that Kloth acted in accordance with her character trait (or habit, as he labels it) of harassing inmates. Defendants also oppose on security grounds, arguing that giving Leiser this type of information creates a security risk because the inmate might be able to use that information improperly against that employee. This argument is puzzling because Kloth is no longer employed at Stanley, so it is unclear why Leiser would be able to this information against her. However, I'll clear up this confusion by directing defendants to submit those documents to me under seal for my *in camera* review. Once I've reviewed them, I'll issue a follow up order resolving whether defendants must produce this information. As such, Leiser's and defendants' motions are denied in part, and I'm deferring my ruling as to Kloth's disciplinary history and the internal and external complaints filed against her.

**Amending the Schedule**

Trial currently is set for November 13, 2017, with motions and limine and Rule 26 disclosures due by October 23. To give the parties time to resolve the outstanding discovery dispute and to provide some breathing room before trial, I am striking the trial date. Because of the holidays, my plan is to reset the jury selection and trial for one of these dates: January 16, 22, or 29. Other dates would be reset to match the trial date. Not later than November 3, 2017, the parties should report to the court which of these date(s) they prefer and which date(s) will not work.

In Leiser's other pending case, *Leiser v. Hannula*, Case No. 15-cv-328-slc, the court is in the process of recruiting counsel on Leiser's behalf. I am not planning to recruit counsel for Leiser in this case because the disputed facts that require a trial are remarkably straightforward and Leiser has more than adequately represented himself in this matter. That said, once the court recruits counsel for Leiser in 15-cv-328-slc, if there is a mutual interest in global mediation, the court will assist the parties with this if they ask.

ORDER

IT IS ORDERED that:

(1) Defendants' Motion for Summary Judgment (dkt. 21) is DENIED.

(2) Plaintiff Jeffrey Leiser's Motion to Strike (dkt. 38) is DENIED.

(3) The parties's discovery motions (dkts. 17, 18) are DENIED in part as provided above. Defendants are DIRECTED to submit Kloth's disciplinary history and internal and external complaints filed against her, to the court under seal for the court's *in camera* review by **November 3, 2017.**

(4) All deadlines and the trial date in this matter are hereby STRICKEN, to be re-set after allowing the parties until November 3, 2017, to provide input on the new trial date.

Entered this 19th day of October, 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge